

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1330 | **DATE** | 7/19/2004 |
| **CASE TITLE** | | Alfredo J. Salinas vs. JoAnne B. Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Plaintiff's Motion for Summary Judgment [9-1] is granted and this case is hereby remanded to the Commissioner for further proceedings consistent with this opinion. Defendant's Motion for Summary Judgment [10-1] is denied.  Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number | |
| | No notices required. | | number of notices | | |
| ✔ | Notices mailed by judge's staff. | | JUL 22 2004 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | 12 |
| ✔ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 7/20/2004 | | |
| SRB | courtroom deputy's initials | 2004 JUL 21 AM 11:06 | date mailed notice | | |
| | | FILED | SB mailing deputy initials | | |
| | | Date/time received in central Clerk's Office | | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ALFREDO J. SALINAS,                    )
                                       )
      Plaintiff,                       )
                                       )
vs.                                    )   No. 03 C 1330
                                       )   Nan R. Nolan,
JO ANNE B. BARNHART,                   )   Magistrate Judge
Commissioner of Social Security,       )
                                       )
      Defendant.                       )

DOCKETED
JUL 2 2 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Alfredo Salinas seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1603, 1614(a)(30). This matter is before the court on the parties' cross-motions for summary judgment. Salinas asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision denying Salinas's application.

## PROCEDURAL HISTORY

Salinas filed an application for SSI on July 12, 2001, alleging that he had been disabled since May 1, 1999, due to pain in his back and legs, and blackouts. (Administrative Record ("R.") at 98-100, 112). The Agency denied his application at the initial levels of administrative review (R. 60-63, 65-68), and he requested an

administrative hearing. (R. 39-40). On November 20, 2002, an administrative law judge ("ALJ") conducted a hearing at which Salinas, represented by counsel, appeared and testified. (R. 21-57). In addition, Linda Gels testified as a vocational expert. (R. 52-56). In a decision dated November 29, 2002, the ALJ found that Salinas was not disabled because he retained the ability to perform a significant number of jobs in the national economy. (R. 13-20). This became the final decision of the Commissioner when the Appeals Council denied Salinas's request for review of the decision on January 17, 2003. (R. 7-8). *See* 20 C.F.R. §§ 416.1455; 416.1481. Salinas has appealed that decision to the federal district court, where the parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND

Salinas was born on April 15, 1949, making him fifty-three years old at the time of the ALJ's decision. (R. 98). He has a high school equivalency degree. (R. 39). He served with the Marines in Viet Nam, and was honorably discharged in 1969. (R. 39, 105-106). The bulk of Salinas's work experience has been as a truck driver (R. 113, 121, 135), although he has little work history over the last fifteen years. (R. 104, 113, 121). In the 1990s, he worked briefly as a day laborer stocking shelves, and as decorator setting up trade show displays. (R. 121-24). He lost the trade show job when he was incarcerated for stabbing his brother in an altercation. (R. 28, 38-39). He has lived with another brother since his release. (R. 38).

2

## A. Medical Evidence

The relevant medical evidence in this case dates from July 12, 2001, the day Salinas applied for SSI and shortly after his release from prison. (R. 155). At that time, he sought treatment at the West Side Veteran's Administration ("WSVA"), reporting that he had experienced two syncopal episodes while incarcerated. (*Id.*). When he returned the next day with his medical records from the prison, the attending physician at WSVA noted that there was no mention of any syncopal episodes. (*Id.*). The physician also noted that Salinas had a history of chronic low back pain, and hypertension. (R. 155-56). Because Salinas's blood pressure was elevated at the time, the physician prescribed Lisinopril, in addition to the Atenolol Salinas was already taking. (R. 156).

On July 27, 2001, Salinas returned to WSVA, complaining of fatigue and occasional dizziness. (*Id.*). He reported that he had a hard time walking a mile, but that he pushed himself to walk six miles, which "wipe[d] him out." (*Id.*). The attending physician noted that Salinas's blood pressure was under better control, and scheduled several tests in the hope of confirming Salinas's reports of seizures. (R. 157). Salinas underwent a CT scan of the brain on July 31, 2001, which was interpreted as normal. (R. 220).

On August 6, 2001, Dr. Kenneth Nave examined Salinas at the request of the state disability agency. (R. 197-203). Salinas reported that he had been suffering low back pain over the preceding seventeen years, and that it had worsened recently. (R. 197). Salinas related that he had been told he had a herniated disc. (*Id.*). He also complained of a

**3**

sharp, intermittent, cramping and pulling sensation in his legs. (*Id.*). Salinas claimed to have experienced blackouts twice a month for the preceding two years. (*Id.*). Dr. Nave noted that Salinas had a history of hypertension, and that his blood pressure was under fair control with medication. (R. 198, 201). Physical examination was essentially normal, with the exception of Salinas's knees and lower back. (R.198-200). Dr. Nave found moderate degenerative joint disease in Salinas's knees, but no swelling, tenderness, or redness. (R. 199). Salinas's range of motion in his lumbar spine was limited to 80 out of 90 degrees on flexion; there were no other range of motion limitations. (R. 200). His grip strength was 5/5 bilaterally. (*Id.*). Mental status was normal. (*Id.*). Dr. Nave diagnosed chronic low back pain, and suggested radiological testing to confirm the origin. (*Id.*). The doctor also indicated that the pulling and cramping in Salinas's legs might be secondary to his back problem. (R. 201). He thought Salinas's blackouts might be consistent with angina. (*Id.*).

On August 15, 2001, Salinas underwent an EEG at WSVA. (R. 157). There was no evidence of any abnormality, and no epileptic discharges were seen. (*Id.*). The results of a thallium stress test performed on September 17, 2001, were described as "probably normal." (R. 222). There was no evidence of ischemia or infarction. (*Id.*). When Salinas returned to WSVA on October 19, 2001, the attending physician acknowledged that all test results had been negative for any evidence of syncope or seizures. (R. 221). At that time, Salinas said he had not had an episode since his release from prison. (*Id.*).

4

In connection with Salinas's application for SSI, a state disability agency physician reviewed the preceding medical records and, on December 4, 2001, found that Salinas could occasionally lift or carry up to fifty pounds, frequently lift or carry up to twenty-five pounds, stand or walk about six hours of an eight-hour workday, sit about six hours of an eight-hour workday, and push or pull hand or foot controls without limitation. (R. 204-211). On February 7, 2002, a second state disability agency physician conducted a similar review, and concurred in that assessment. (R. 210).

On January 10, 2002, Salinas went to the WSVA, and reported suffering low back and leg pain every second or third night, with soreness lasting a few days. (R. 227). The "drawer test" was negative for torn ligaments in the knees. (*Id.*). The attending physician recommended aspirin and Tylenol for leg cramps at night. (R. 228).

Salinas had a depression screening at the WSVA on January 17, 2002. (R. 228). He indicated that he had been experiencing symptoms of depression, including sadness and loss of interest in things he formerly cared about. (*Id.*). The attending physician encouraged Salinas to become more physically active. (*Id.*). That same day, the doctor noted that Salinas's leg cramping had responded well to night time medication. (R. 229). X-rays of Salinas's right knee, performed on February 4, 2002, were normal. (R. 232). On April 17, 2002, Salinas returned to WSVA with complaints of lower back pain. (R. 230). Neurological examination – assessing strength, reflexes, and sensation – was

normal. (*Id.*). An x-ray of Salinas's lumbosacral spine demonstrated spurs at the L4-L5 level, and mild osteopenia.[1] (R. 230-31).

During his April 17, 2002 visit to WSVA, Salinas reported that his lower back and knee pain were stable (R. 233). By May 6, 2002, however, he said that his right knee was locking all the time. (R. 234). Salinas underwent an MRI of his right knee on May 13, 2002, which was consistent with a tear of the posterior horn of the medial and lateral meniscus.[2] (R. 235). On June 6, 2002, Salinas underwent arthroscopic surgery on his right knee. (R.243-46). Surgeons were unable to find any tears in the meniscus, but noted chondromalacia[3] changes. (R. 245).

Salinas developed some swelling in both feet, and a rash on his right ankle, and sought treatment at the WSVA on August 7, 2002. (R. 253-54). On August 12, he reported that the rash was recurring, and lasted for two to three days. (R. 255). Thereafter, a social worker discussed Salinas's unemployment with him, and noted that in the last year, Salinas had not checked with his physician to determine what type of work he was capable of performing. (R. 256). Salinas made various excuses about not being able to work, despite having gone a year without any income. (*Id.*). Salinas stated that

---

[1]    Osteopenia is a decrease in bone mass. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, at 1202 (28th ed. 1994).

[2]    The meniscus is a crescent-shaped disk of fibrocartilage in the knee, attached to the tibia. DORLAND'S, at 1013.

[3]    Chondromalacia is a softening of articular cartilage, most commonly in the knee, resulting in pain and crepitus. DORLAND'S, at 321.

he had suicidal thoughts, and appeared emotionally unstable. (*Id.*). He was referred for psychological counseling. (*Id.*).

Salinas then saw Dr. Eiger, the attending psychiatrist that day. Dr. Eiger noted Salinas was depressed, but not at all suicidal. (R. 255). Dr. Eiger felt Salinas's condition might improve if he could get adequate sleep. (*Id.*). During the session, Salinas complained of feeling depressed and helpless due to his physical limitations. (R. 259). He related that he had recently been experiencing flashbacks and nightmares about Viet Nam. (*Id.*). The psychiatrist diagnosed depression and post-traumatic stress, and assigned a GAF score of 45.[4] (*Id.*). He started Salinas on a prescription of Trazodone, for depression. (R. 255). When Salinas returned for counseling on August 20, 2002, the clinical nurse at WSVA referred Salinas to a veteran center closer to his home, and set up an appointment with psychologist Betsy Tolstedt for August 22, 2002. (R. 260). There is no evidence regarding that appointment in the record.

In a report dated November 12, 2002, psychologist Betsy Tolstedt provided a Vet Center Intake Assessment regarding Salinas's mental state. (R. 295-300). She reported that Salinas related having nightmares about Viet Nam since his imprisonment. (R. 299).

---

[4]     The GAF score is a subjective determination, on a scale of 100 to 1, of the clinician's judgment of an individual's overall level of psychological, social, and occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) at 32 (rev. 4th ed.2000). A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

7

He said he was unable to find employment since that time, because he had been unable to perform manual labor. (*Id.*). He also said he was afraid to drive because of his blackouts. (*Id.*). Salinas tied his depression to his inability to draw an income and support his children. (*Id.*). He stated that he was separated from his wife, and told Dr. Tolstedt that she had had him arrested several times for domestic battery, although he had never hit her. (*Id.*). Salinas explained that his imprisonment stemmed from an incident when his brother pulled a knife on him; he was able to wrest it away from his brother and stab him. (*Id.*). Salinas said he distrusts most people, and has to monitor his anger carefully. (*Id.*). Dr. Tolstedt diagnosed post-traumatic stress disorder. (R. 300). She assigned a GAF score of 50. (*Id.*). According to Dr. Tolstedt, Salinas often had periods of moderate dysfunction, and his health problems exacerbated his psychological symptomology. (*Id.*).

### B. Plaintiff's Testimony

At the administrative hearing, Salinas testified that, over the preceding fifteen years, he had not worked at any job for very long. (R. 27). He said he had difficulty getting along with co-workers, or people in general, because they tended to make him angry. (R. 27, 29). Salinas testified that he does not socialize, likes being left alone, and is afraid of getting into a fight if someone aggravates him. (R. 29, 31). He has two friends, whom he visits about once a week or every two weeks. (R. 47-48).

Salinas admitted he was arrested and imprisoned for stabbing his brother. (R. 28). Explaining this incident as self defense, Salinas testified that he could not recall exactly

what had happen because he blacked out. (R. 29). Salinas also related that he was separated from his wife, and said that she had had him arrested – wrongfully – more than once for hitting her. (R. 29).

According to Salinas, he suffers constant pain in his lower back. (R. 32). He also said that, despite surgery, he continued to have problems with his right knee. (R. 32-33). It was still tender, Salinas explained, and he was not sure when it would give out. (R. 33). He said that he experiences blackouts – most recently, a month and a half before the hearing – which begin with chest pains and render him unconscious. (*Id.*). The chest pains are sudden and sharp. (R. 34). Salinas said these episodes began when he was incarcerated after the fight with his brother. (R. 40). He said he had seven blackouts while he was in prison, and two more since he has been out. (R. 40-41). According to Salinas, it took him about a half-out after a blackout to gain focus again. (R. 44). Salinas also stated that he would be having surgery for prostate cancer about a month after the hearing. (R. 33).

Salinas testified that he had been seeing a psychologist, Dr. Tolstedt, on a weekly basis since August of 2002. (R. 36). He described these sessions as involving seeing a movie with a group, then talking with Dr. Tolstedt individually for about an hour. (R. 37). He said the medication he was taking, Trazodone, helped him sleep but did not prevent him from dreaming about Viet Nam. (R. 31, 37, 43). Salinas stated he had these

nightmares every other night. (R. 43). In order to clear his head afterward, Salinas said he would go to the lakefront. (R. 44).

Salinas testified that he could only walk about four blocks at a time, however, and that he would sometimes catch a bus after that. (*Id.*). He thought he could sit for about ten or fifteen minutes before having to change positions, and stand for about fifteen or twenty minutes before having to walk around. (R. 50). Salinas estimated that he could lift about ten pounds. (R. 51). He said he was unable to do any chores around the apartment because of his back. (R. 44-45). According to Salinas, his medication does not help his back pain much. (R. 45). He did state, however, that the medication for his leg was working. (R. 46). About all he did during the day, he said, was read or watch TV. (R. 46-47). Salinas stated that he accompanied his brother to the laundromat and grocery store. (R. 47). He also stated that he went grocery shopping alone sometimes, for "light stuff." (R. 47).

## C. Vocational Expert's Testimony

The VE testified after Salinas, and both she and the ALJ assumed, based on Salinas's sporadic work history in the preceding fifteen years, that Salinas had no past relevant work. (R. 52-53). The ALJ asked whether a hypothetical individual of the same age, education, and work background as Salinas, who could lift twenty pounds occasionally, ten pounds frequently, sit or stand for six hours in a workday, and walk occasionally, but who could not climb stairs or ladders, work at unprotected heights, or

**10**

operate dangerous machinery, could perform any work in the regional economy. (R. 53). The VE indicated that there were 11,000 assembler jobs and 8,000 packager jobs in the Chicago area that such an individual could perform. (R. 54). The ALJ then asked whether a hypothetical individual with those same limitations, who was also unable to perform complex or detailed tasks, or work with the general public or closely with others, could perform any work in the regional economy. (*Id.*). The VE explained that the types of work she had already suggested required proximity with others, but not interpersonal interactions. (R. 54-55). Next, the ALJ asked whether an additional restriction of needing to change positions every ten to twenty minutes would affect the occupational base. (R. 55). The VE felt that such an individual would not be able to maintain a regular work routine. (R. 55).

### D. The ALJ's Decision

The ALJ found that Salinas had not engaged in substantial gainful activity since he filed for benefits on July 12, 2001. (R. 14, 19). Next, she determined that Salinas had several severe impairments: hypertension, a history of syncopal episodes, depression with post-traumatic stress disorder, degenerative arthritis in the knees, and arthritis in the lumbar and cervical spine. (R. 14). These impairments, according to the ALJ, met the Agency's requirement that a severe impairment significantly limit the ability to perform basic work activities. (*Id.*). *See* 20 C.F.R. § 416.920(c). The ALJ further determined, however, that none of these impairments, either singly or in combination, met or equaled

11

an impairment listed in the Agency's regulations as disabling. (R. 14, 19). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments.

Next, the ALJ assessed Salinas's residual functional capacity ("RFC"). The ALJ found that Salinas retained the capacity to lift twenty pounds occasionally and ten pounds frequently, sit or stand for six hours each in a workday, and walk occasionally, but could not climb stairs or ladders, work at unprotected heights or operate dangerous machinery, perform complex or detailed tasks, or work with the general public or closely with others. (R. 14, 19). The ALJ reviewed the medical evidence, discussing Salinas's course of treatment at WSVA. (R. 15-17). She noted that the etiology of Salinas's complaints of chest pain and blackouts was undetermined, with an EEG being normal. (R. 15). She further noted that, in reference to Salinas's back and leg pain, Salinas had a near normal range of motion in his lumbar spine, and no neurological deficits. (R. 15-16). The ALJ acknowledged that lumbar spine x-rays showed spurring at L4-L5 and evidence of osteopenia. (R. 16). She also acknowledged that Salinas underwent right knee surgery for a torn meniscus, but that the actual problem had been chondromalacia. (R. 16).

The ALJ then turned to Salinas's mental impairments. She noted that he had been referred to a psychiatrist on August 12, 2002, when he had given the impression he might be suicidal during one of his visits to WSVA. (R. 16). She also noted that the psychiatrist who then saw Salinas did not find him to be suicidal. (*Id.*). The ALJ acknowledged that Salinas was diagnosed with depression and post-traumatic stress disorder, and given a

**12**

prescription for Trazodone. (*Id.*). She then discussed Salinas's session with Dr. Tolstedt, who diagnosed post-traumatic stress disorder exacerbated by socioeconomic and health problems. (R. 17). The ALJ also noted that Dr. Tolstedt assigned Salinas a GAF score of 50. (*Id.*).

The ALJ determined that the medical evidence did not support the existence of limitations on Salinas's capacity for work any greater than those she had found. (R. 17). She stated that she considered the factors described in 20 C.F.R. § 416.926(c)(3) and Social Security Ruling 96-7p. (R. 17). The ALJ felt Salinas exaggerated some of his complaints, noting that his allegations of blackouts were inconsistent. (R. 17). She explained that, although Salinas alleged he was unable to hold a job because he could not get along with others, he also testified that his jobs had ended for various reasons other than his conduct. (R. 17). The ALJ questioned why, given Salinas's allegations of disabling symptoms, the medical record did not include some statement by a treating physician indicating Salinas's ability to work was restricted. (*Id.*). On the other hand, the ALJ noted, state disability agency physicians had found Salinas not disabled. (*Id.*).

The ALJ then addressed Salinas's GAF score of 50. (R. 17-18). The ALJ indicated that Dr. Tolstedt had seen Salinas just one time, and appeared to have accepted his account of his inability to work without question. (R. 18). The ALJ found that nightmares were the only symptom of Salinas's post-traumatic stress disorder, and that there was no indication that this had any affect on Salinas's ability to work. (*Id.*). Finally, the ALJ also

13

noted that while Salinas had mentioned he had suicidal thoughts during a WSVA visit, prompting a psychiatric referral to Dr. Eiger, Dr. Eiger found Salinas was "not at all suicidal." (*Id.*). Again, the ALJ found that the evidence did not warrant any greater restrictions on Salinas's capacity for work than she had found.

The ALJ went on to consider Salinas's age, education, and work experience, as those factors are categorized in the Medical-Vocational Guidelines, Appendix 2, Subpt. P, of the Agency's regulations. She found that Salinas was closely approaching advanced age, had a high school equivalency degree, and had no past work experience. (R. 18). Assuming Salinas had a capacity for a full range of light work, the ALJ noted that the Medical-Vocational Guidelines would direct a finding that Salinas was not disabled. (*Id.*). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.13. Considering that Salinas had additional restrictions on his ability to perform light work, however, the ALJ noted that the VE testified that an individual with Salinas's limitations could perform work that existed in significant numbers in the regional economy. (R. 18, 19). Based on that testimony, the ALJ concluded that Salinas was not disabled, and was not entitled to SSI under the Act. (R. 18-19).

## DISCUSSION

### A. Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C.

§§ 405(g); 1382(c)(3). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997), *citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion*, 108 F.3d at 782. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.*

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must have "articulated" the reasons for her decision at "some minimum level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Id.* Although the ALJ need not address every piece of evidence, the ALJ cannot limit her discussion to only that evidence that supports her ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of her findings

15

and afford the plaintiff a meaningful judicial review. *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002).

## B. Five-Step Inquiry

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §416.920; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C. Analysis

Salinas challenges the ALJ's decision on three grounds, all of which have to do with evidence regarding his mental impairment. First, he argues that the ALJ ignored certain evidence in the record regarding his mental impairment, specifically, Dr. Eiger's report dated August 12, 2002. Second, Salinas contends that the evidence pertaining to his mental impairments contradicts the limitations the ALJ found on his capacity for light work. Finally, according to Salinas, the ALJ failed to perform her duty of fully developing the record because she did not contact Dr. Tolstedt to question her about Salinas's treatment. Before addressing Salinas's concerns, however, the court notes that in evaluating Salinas's mental impairment, the ALJ failed to follow the regulation applicable to the assessment of mental impairments.

### 1.

The Commissioner is bound by her own regulations and rulings. *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993). In cases where a plaintiff presents evidence that he suffers from a mental impairment, those regulations prescribe a "special technique" the ALJ must follow. 20 C.F.R. 416.920a(a). Under the special technique, the ALJ must first evaluate the plaintiff's pertinent symptoms, signs and laboratory findings to determine whether he has a medically determinable mental impairment(s). 20 C.F.R.§ 416.920a(b)(1). If so, the ALJ must then rate the degree of functional limitation resulting from the impairment(s). § 416.920a(b)(2). This entails a consideration of such factors as

the quality and level of the plaintiff's overall functional performance, any episodic limitations, the amount of supervision or assistance he requires, and the settings in which he is able to function. 20 C.F.R. § 416.920a(c)(2). The ALJ must rate the plaintiff's degree of functional limitation in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c)(3). In the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), the ALJ employs a five-point scale to rate the degree of limitation: none, mild, moderate, marked and extreme. To rate the degree of limitation in the fourth functional area (episodes of decompensation), the ALJ employs a four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. 20 C.F.R. § 416.920a(c)(4). If the ALJ rates the degree of limitation in the first three functional areas as "none" or "mild," and "none" in the fourth area, she generally may conclude that the impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the plaintiff's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1). If the mental impairment(s) is severe, the ALJ will then determine if it meets or is equivalent in severity to a listed mental disorder by comparing the medical findings and the ratings of the degree of functional impairment to the criteria of the appropriate listing. 20 C.F.R.§ 416.920a(d)(2). If the plaintiff's

**18**

impairment is severe, but does not meet the listings, the ALJ will assess the plaintiff's RFC. 20 C.F.R. § 416.920a(d)(3).

In this case, the ALJ's decision does not indicate whether she applied this prescribed technique to evaluate the functional limitations of Salinas's mental impairment. The regulations clearly require that the ALJ "document application of this technique" by including "a *specific finding* as to the degree of limitation in each of the functional areas in his decision." 20 C.F.R. § 416.920a(e)(2)(emphasis added).[5] While the ALJ here found that Salinas's mental impairment is severe, she made no mention of the "technique" and does not even allude to any of the four functional areas in her decision, let alone make any specific findings. Even when the ALJ assessed Salinas's mental impairment under the listings – an assessment that ordinarily involves reference to the degree of limitation in the four functional areas as the listings incorporate them in the "B" criteria, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments, 12.01 *et seq.* – she made no specific finding as to any functional limitations. Instead, the ALJ briefly noted:

> In this case, the claimant does not have an impairment or combination of impairments that meets or equals the requirement of a listed impairment.

---

[5] Under the former version of this regulation, the ALJ was required to document these findings by completing a Psychiatric Review Technique Form and including it in his opinion. The regulation was revised effective September 20, 2000. While it no longer requires completion of the form, it nevertheless mandates the documentation of the application of the technique with specific findings in the ALJ's opinion. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.Reg. 50746, 50774-50775 (August 21, 2000).

For example, the arthritis in the claimant's cervical and lumbar spine has not resulted in neurological deficits, as required by section 1.04.

(R. 14). Thus, there is nothing in the ALJ's decision that approaches compliance with the regulation's requirement of specific findings as to the degree of limitation in the four functional areas. This failure to follow the applicable regulations and document the application of the "special technique" amounts to an error of law that necessitates a remand of this case to the Commissioner.

## 2.

While the ALJ's failure to follow 20 C.F.R. § 416.920a and apply the "special technique" to evaluate Salinas's mental impairment warrants a remand in and of itself, it also raises doubts about her analysis of the evidence regarding that impairment. In particular, it calls into question the ALJ's treatment of the two GAF scores that are part of the medical record: a 45, which Dr. Eiger assigned on August 12, 2002, and a 50, which Dr. Tolstedt assigned on November 12, 2002. The ALJ failed to consider Dr. Eiger's assessment, and rejected Dr. Tolstedt's assessment. Both scores are indicative of an individual with serious symptoms – such as suicidal ideation or obsessive rituals – or a serious impairment in social or occupational functioning – such as having no friends, or being unable to keep a job. These are the types of limitations on functioning that the "special technique" specifically addresses, but the ALJ failed to adequately consider them here.

Contrary to Salinas's argument (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 4), the ALJ did not completely ignore Dr. Eiger's report of August 12, 2002. She did, however, fail to mention that Dr. Eiger assessed Salinas's level of functioning in that report, and assigned him a GAF score of 45. While it is true that the ALJ need not provide a written evaluation of every piece of evidence in the record, *Scheck*, 357 F.3d at 700, this omission becomes significant when it is considered with the ALJ's treatment of the other GAF score in the record, the score of 50 that Dr. Tolstedt assigned Salinas on November 12, 2002.

Dr. Tolstedt – like Dr. Eiger – assigned Salinas a GAF score that was indicative of an individual with serious symptoms or a serious impairment in social or occupational functioning. In her consideration of Dr. Tolstedt's November 12, 2002 report, however, the ALJ found the score insignificant for the following reasons:

> First, contrary to the claimant's assertion of an ongoing treatment relationship, the evidence supports that the psychologist evaluated the claimant one time. Second, it appears that the psychologist accepted the claimant's representation of an inability to work without question. That self-assessment by the claimant is not accepted, as much of the claimant's assertions seemed geared to the purpose of obtaining disability benefits. Parenthetically, although the psychological assessment states without detail that the claimant has PTSD symptoms, the only symptom he described was nightmares. The claimant testified that he deals with the nightmares by leaving home and walking to the lake. Work would have a similar result. The record also includes a VA psychiatrist's statement that suggests that the claimant was engaging in possible misrepresentation. As noted, the claimant told his dermatologist that he wanted to see a psychiatrist, stating that he had suicidal thoughts. However, the examining psychiatrist mentioned that he was not at all suicidal. This evidence suggests that the claimant has

consciously attempted to describe symptoms or portray limitations that are not actually present in order to increase the chance of obtaining benefits.

(R. 18 (citations omitted)). According to the ALJ, then, Dr, Tolstedt's assessment of Salinas's level of functioning was worthy of little weight because it was the product of a single visit and reflected an uncritical acceptance of Salinas's complaints, which the ALJ felt were exaggerated based on the other psychiatric evidence in the record. Given the ALJ's failure to consider the GAF score Dr. Eiger assigned Salinas – which, at 45, is consistent with Dr. Tolstedt's assessment – the ALJ's reasoning is unconvincing.

An ALJ can reject an examining medical source's opinion only for reasons supported by substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Under the regulations, the ALJ must generally consider whether an examining source's opinion is supported by evidence, is consistent with the medical record, and whether that source is a specialist in the relevant area. 20 C.F.R. 416.927(d). Here, the ALJ's first criticism of Dr. Tolstedt's assessment was that it was unconvincing because it was based on a single visit. This might have been the case – although there is some evidence to the contrary[6] – but it was nevertheless the product of an examining

---

6    Salinas's testimony that he had been seeing Dr. Tolstedt on a weekly basis beginning in August of 2002 was fairly specific, including times and description of the sessions. (R. 36-37). A note from WSVA indicates he had an appointment for August 22, 2002. (R. 260). While there are no clinical notes regarding such treatment in the record, Dr. Tolstedt does refer to notes in the cover sheet for her November 12, 2002 assessment of Salinas. (R. 295). On the other hand, in that same report, Dr. Tolstedt

(continued...)

22

source which should be accorded at least some weight, especially given the remainder of the record in this case. 20 C.F.R. 416.927(d)(1)("Generally, we give more weight to the opinion of a source who has examined you than to a source who has not examined you."). The record includes the evaluation of only one other examining source, Dr. Eiger, who assessed Salinas's functioning on a similar, if slightly more restricted, level. Indeed, the record does not even include a conflicting assessment of Salinas's mental impairment from a non-examining source: the state disability agency physicians reviewed the medical record prior to any assessment of Salinas's psychological state. The fact that Dr. Tolstedt may have examined Salinas on just one occasion is an insufficient reason, given this record, to reject her assessment of Salinas's functional limitations.[7]

---

[6](...continued)
states that Salinas was not under any psychiatric treatment other than "being followed at [WSVA] for care of physical health and for psychiatric medication." (R. 297). Dr. Tolstedt makes no mention that she was treating Salinas on an ongoing basis, or that she had seen him any more than the one time reflected in her report. Finally, Dr. Tolstedt titles her report as an "intake assessment," suggesting that it reflected the first time she saw Salinas. For the purposes of this opinion, however, the court assumes that Dr. Tolstedt examined Salinas on just one occasion.

[7]    Salinas argues that if the ALJ had concerns about whether Dr. Tolstedt's report was based on a single interview or on an uncritical acceptance of Salinas's complaints, the ALJ should have contacted Dr. Tolstedt. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 4, 6). The regulations and rulings require an ALJ to contact a treating physician before rejecting his or her opinion under two circumstances: (1) when the evidence from the treating physician or other medical source is "inadequate for [the Administration] to determine whether [the claimant is] disabled," 20 C.F.R. § 416.1512(e), and (2) when the treating source provides an opinion on an issue reserved to the Commissioner, and the basis for the opinion is not clear, SSR 96-5p, 1996 WL 374183, at * 6. Because the court assumes, for the
(continued...)

The ALJ did provide an additional criticism of Dr. Tolstedt's assessment: that it reflected an uncritical acceptance of Salinas's complaints. According to the ALJ, Dr. Tolstedt should not have accepted Salinas's allegations because he was not credible. As an example, the ALJ noted that Salinas's examining psychiatrist, Dr. Eiger, found that Salinas was not suicidal despite Salinas's claim of having suicidal thoughts. Again, however, the ALJ neglected to mention Dr. Eiger's also assigned Salinas a GAF score of 45. While Dr. Eiger may not have believed Salinas was suicidal, he did appear to believe that Salinas was limited to a similar degree that Dr. Tolstedt found. As already noted, the ALJ may not select and discuss only that evidence that favors her ultimate conclusion. *Herron*, 19 F.3d at 333. Here, however, the ALJ chose to discuss only those portions of Dr. Eiger's report that she felt undermined Dr. Tolstedt's assessment of Salinas's functioning. In so doing, the ALJ ignored the fact that the only two examining sources to assess the effect Salinas's mental impairment had on his level of functioning arrived at consistent conclusions.

**3.**

The ALJ in this case failed to follow the regulation that governs the evaluation of mental impairments, 20 C.F.R. § 416.920a. For this reason alone, a remand of this case is warranted. Additionally, however, the court finds that the ALJ's failure also adversely

---

[7](...continued)
purposes of this opinion, that Dr. Tolstedt examined Salinas on a single occasion and remands this case for other reasons, it need not address this issue.

affected her consideration of the evidence pertaining to Salinas's mental impairment. Two examining sources – a psychiatrist and a psychologist – provided similar assessments of Salinas's functional limitations. Rather than consider both under 20 C.F.R. § 416.920a, the ALJ ignored one and rejected the other for reasons that reflect a selective consideration of only that evidence that favored the ALJ's ultimate conclusion. As a result, the ALJ failed to adequately consider an entire line of evidence regarding the effects of Salinas's mental impairment. When the ALJ ignores an entire line of evidence that is contrary to the ruling, it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). This, too, warrants a remand of this case to the Commissioner.

## CONCLUSION

For the foregoing reasons, the court grants summary judgment in favor of the plaintiff, Alfredo Salinas, and remands this case to the Commissioner for further proceedings consistent with this opinion.

ENTERED: *Nan R. Nolan*
NAN R. NOLAN
UNITED STATES MAGISTRATE JUDGE

DATE: July 19, 2004